## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

04 FEB 25 PM 3: 52

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CRIMINAL NO. 03-1451 BB

KURT DONALD COUSINS and
BUKOLA TOLASE-COUSINS,

Defendants.

---

### UNITED STATES'S PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States of America, through its counsel DAVID C. IGLESIAS,

United States Attorney for the District of New Mexico, and BILL PFLUGRATH,

Assistant United States Attorney, respectfully responds to this Court's request for

proposed findings of fact and conclusions of law regarding the motion to suppress

evidence conducted on February 13, 2004.

I.     **Curtilage.  The side yard is not part of defendants' curtilage because it is
not so intimately associated with the sanctity of their home as to come
under the umbrella of the Fourth Amendment's protections**

    A.   Initial Discussion

As discussed below, there is no evidence defendants did much more with

their side yard than plant melons as a possible extension of their garden.  There

is no evidence they used the area for any family functions other than as an



egress point to the back yard and to store their garbage can nearby, and sometimes in that area.

Defendants may argue the bush in front of the side yard shielded that area from public view, and it only became open after it was trimmed by the PNM line men to gain access to the transformer. However, there is no evidence that but for the trimming, the side yard would have been shielded from public view. In fact, there is evidence that when Mr. Bryant drove up in his PNM truck to see if defendants had further tampered with the PNM meter on July 2, 2003, he saw automobile jumper cables hanging from the meter location from where he was parked on the street. That observation was made before the PNM line men arrived and before the bush was trimmed.

Defendants effectively recharacterized the nature and utility of the side gate when they hot wired their PNM meter to steal electricity. This act placed a ring of dangerousness around the meter because there was a risk of electrical arcing that could jump from the meter to anyone passing by. Their repeated criminal efforts to thwart PNM's discontinuation of service also invited others into that very area, thus depriving it of any degree of "sanctity."

While defendant argues one can not see much through the heart-shaped holes in the gate, a plain observation of Government's Exhibit 2 shows one can actually see the diagonal slates in defendants' back yard (as seen in Government's Exhibit 8) from the public street in front of defendant's home. That is the same hole in the fence the officers looked through when they looked into the back yard.

B. Proposed Findings of Fact

2

1.  The side yard consists of a paved walkway next to the garage, and electrical meter in plain view on the wall, and a gas meter to below and off set to the electrical meter.  Motion to Suppress Transcript, Feb. 13, 2004, at 60 ("Trans").

2.  Defendants considered the side yard part of garden and had planted melon seeds in that area.  Id. at 201 & 203.

3.  Defendants said they had no expectation people walking up to the side gate.  Id. at 202.

4.  PNM meter readers show up at a residence unannounced and within a three-day window each month, but not on a set date, and appointments are not made with occupants.  Id. at 57-58.

5.  PNM meter readers also look for tampering of their meters.  Id. at 58.

6.  Mr. Bryant, PNM Field Collector, said he had been to defendants' side yard about five times, and his co-worked had also been to that side yard. Id. at 72.

7.  Mr. Bryant never noticed anything in that side yard area such as a barbecue (id. at 61), lawn chairs (id. at 61), or anything else to suggest a use for that area.  Id. at 61 & 72.  He never had to push through bushes to get to side yard or move barricade.  Id. at 72.

8.  The officers did notice vegetation in that area, but it was not distinguishable (id. at 34 & 112), and no melons were seen.  Id. at 120.

9.  Mr. Bryant said defendants have kept their garbage can in the area of the PNM meter up against the wall, near the front of the garage, and near the far west side of walkway. Id. at 74.

10. On June 12, 2003, Mr. Bryant went to defendants' home to disconnect power for nonpayment and did so.  Id. at 58.

11.     On July 2, 2003, Mr. Bryant went back to defendants' home to disconnect gas for nonpayment. Id. at 61.

12.     On July 2, 2003 Mr. Bryant discovered someone had cut seal off electric meter, face plate removed, removed the meter, took the boots off, and put the meter back in; and such actions are tampering with PNM meter to obtain a service. Id. 62.

13.     On July 2, 2003, Mr. Bryant removed the electric meter and put a plastic face plate in the sockets where the meter would go, resealed it, and put a lock on the electric meter itself; he also disconnected gas service. Id.

14.     This Court took judicial notice there are New Mexico State statutes dealing with theft of utility services and with criminal damage relating to PNM meters. Id. at 62-63. The activities described by the PNM Field Collector may have been charged to defendants as State crimes. Id. (applicable State statutes are listed in the United States response brief to the Motion to Suppress, at 3).

15.     Actions discovered on July 2, 2003 constituted tampering with a PNM utilities meter. Id at 63.

16.     On July 3, 2003, Mr. Bryant returned to defendants' home. He could see automobile battery jumper cables attached to the PNM meter area from his vehicle parked on the public street. Id. at 64-65. There is no way to measure electrical use when jumper cables are attached to the meter area. Id. at 85.

17.     As a result of illegally and improperly hot-wiring electrical power with jumper cables, there was an electrical arc hazard out as far as 2-3 feet. Id. at 66.

4

18.   While Mr. Bryant was waiting for the line men to arrive to disconnect the jumper cables, he looked through the open side gate; he was certain it was fully open.  Id. at 66 & 81.  He had seen gate open one other time.  Id. at 75.

19.   PNM trouble truck employees (line men) entered side yard and took the jumper cables off.  Id. at 68.

20.   PNM trouble truck employees cut back a bush to gain access to a transformer box near the front yard.  See id. at 212.  Defendants periodically trimmed side yard bushes, which had the effect of maintaining public view of the side yard.  Id. at 204.

21.   The only window on the south side of defendants' home on the lower level is located behind the side fence.  Id. at 33.

C.  Proposed Conclusions of Law

1.   A determination whether an area is within the curtilage of a home is a factual issue and is subject to a clearly erroneous standard of review.  United States v. Swepston, 987 F.2d 1510, 1513 (10th Cir. 1993).

2.   If the officers were not in the curtilage, but the marijuana plants were in the curtilage, albeit open to ordinary visual observation by another, then there was no violation of any reasonable expectation of privacy.  United States v. Hatfield, 333 F.3d 1189, 1197 (10th Cir. 2003), citing California v. Ciraolo, 476 U.S. 207, 213 (1986); see also United States v. Pace 955 F.2d 270, 273 (5th Cir. 1992) (holding that peering through a small opening in the back of a locked barn was not a search); United States v. Wright, 449 F.2d 1355 (D.C. Cir. 1971) (holding that shining a flashlight

5

through a gap between the defendant's closed garage doors was not a search).

3.   "Curtilage" is "the area that harbors the intimate activity associated with the sanctity of a man's home and the privacies of life. . . ." Oliver v. United States, 466 U.S. 170, 180 (1984)

4.   To assist in determining whether an area falls within the curtilage, the following four factors were adopted: (1) the proximity of the area to the home; (2) inclusion of the area within an enclosure surrounding the home; (3) the nature and uses of the area; and (4) steps taken by the resident to protect the area from observation by persons passing by. See United States v. Dunn, 480 U.S. 294, 301 (1987).

5.   The Dunn factors are not a mechanical four-part test, rather they are useful "only to the extent they bear upon the central question of whether the area is so intimately tied to the home that it should be placed under the home's umbrella of Fourth Amendment protection." United States v. Long, 176 F.3d 1304, 1307 (10th Cir. 1999).

6.   An area in which garbage is regularly deposited is not generally associated with the intimate activities of the home. Long, 176 F.3d at 1309.

2.   **Objective Probable Cause to Enter Defendants' Property**. The officers were justified in entering defendant's side yard because their was an objective expectation of finding probable cause there that defendants were willfully obtaining electrical services without paying for such services.

A. Initial Discussion

6

Defendants were blatantly stealing electrical service from PNM. They had to purposefully break into the sealed electrical meter area and risk electrical shock to attach automobile battery jumper cables to regain electrical power.

Although the officers were focused on investigating the marijuana cultivation, there is no doubt they had probable cause to believe defendants had tampered with the PNM meter and were obtaining electrical services without paying for them. They may have subjectively discounted one crime while focusing on another, but the fact remains the any one of the officers was authorized "to arrest without a warrant any person he has probable cause for believing has committed the crime of falsely obtaining services. . ." See NMSA § 30-16-16(B). Their presence near the PNM meter was reasonable because they had probable cause of another crime, regardless of whether their investigation was focused on that crime or not.

This Court recognized that "[i]f the curtilage has been invaded without probable cause, then the issue of the warrant seems to be tainted by what was discovered after the violation of the Fourth Amendment." Trans. at 218 (¶ 20-23). The United States argues the officers had probable cause when they entered the side yard, albeit for another crime than the one then being investigated, and what was discovered did not have Fourth Amendment protections, as discussed below.

B.  Proposed Findings of Fact

1.     On June 12, 2003, Mr. Bryant went to defendants' hope to disconnect power for nonpayment and did so. Trans. at 58.

7

2.    On July 2, 2003, Mr. Bryant went back to defendants' home to disconnect
      gas for nonpayment. Id. at 61.

3.    On July 2, 2003 Mr. Bryant discovered someone had cut seal off electric
      meter, face plate removed, removed the meter, took the boots off, and put
      the meter back in; and such actions are tampering with PNM meter to
      obtain a service. Id. 62.

4.    On July 2, 2003, Mr. Bryant removed the electric meter and put a plastic
      face plate in the sockets where the meter would go, resealed it, and put a
      lock on the electric meter itself; he also disconnected gas service. Id.

5.    This Court took judicial notice there are New Mexico State statutes
      dealing with theft of utility services and with criminal damage relating to
      PNM meters. Id. at 62-63.  The activities described by the PNM Field
      Collector may have been charged to defendants as State crimes.  Id.
      (applicable State statutes are listed in the United States response brief to
      the Motion to Suppress).

6.    Actions discovered on July 2, 2003 constituted tampering with a PNM
      utilities meter. Id at 63.

7.    On July 3, 2003, Mr. Bryant returned to defendants' home.  He could see
      automobile battery jumper cables attached to the PNM meter area from
      his vehicle parked on the public street.  Id. at 64-65.  There is no way to
      measure electrical use when jumper cables are attached to the meter
      area.  Id. at 85.

8.    Defendants' were drawing electrical power into their home on July 3, 2003
      (id. at 204-05), which is after electrical services had been discontinued on
      June 12, 2003.

8

9.      NMSA 30-16-16 provides for arrest for a misdemeanor offense not

committed in the presence of the officer.  NMSA § 30-16-16(B).

C.   Proposed Conclusion of Law

1.      If objective test for probable cause to arrest is met, it is unnecessary that

the officer hold subjective belief he has the basis for an arrest.  United

States v. Reto-Harro, 287 F.3d 1000, 1006 (10th Cir. 2002); United States

v. Salinas-Caldera, 728 F.2d 1298, 1300-01 (10th Cir. 1984).

3.      **No Objective Expectation of Privacy.  The marijuana plants in defendants
back yard are not protected by the Fourth Amendment because there was
no reasonable expectation of privacy in the plants that society would be
willing to recognize**

A.   Initial Discussion

This Court cited to United States v. Hatfield, 33 F.3d 1189 (10th Cir. 2003)

for the proposition that officers may not rely on what they might have seen from

another vantage point if they did not actually make such an observation.  See

Trans. at 219.  The United States agrees with that conclusion, but respectfully

argues that Hatfield should also be read as commenting on the reasonableness

of one's expectation of privacy in an object or area.  In discussing whether there

was a an expectation of privacy that society is prepared to recognize as

reasonable, the court said:

> "Thus, Hatfield would have had no expectation of privacy from Officer
> Harrold's observation of the marijuana had Harrold been standing on
> property owned by Hatfield's neighbor when he made it, for in that
> situation Hatfield would have exposed the marijuana to the view of his
> neighbors and anyone they invited onto their land.  See, e.g., 1 La Fave,

supra, § 2.3(g) at 512-13 ("Certainly no justified expectation [of privacy] is present when the physical facts are such that the incriminating objects or activities were readily visible to persons on neighboring lands.") (citing United States v. Campbell, 395 F.2d 848 (4th Cir. 1968).

Hatfield, 333 F.3d at 1196 (emphasis added).

The United States asks this Court to consider the admitted photographs taken from defendants' neighbors' property and the testimony as to what can be seen from those locations, not to suggest that the officers could have done the same on July 3, 2003—because they did not do so, but to show defendants' had no reasonable expectation of privacy in incriminating objects readily visible to persons on neighboring lands.  There was no Fourth Amendment violation because defendants were notorious in making their criminal activities public to their neighbors and anyone whom their neighbors invited onto their properties. Society is not willing to recognize defendants' argument that 505 marijuana plants would not be noticed when grown outside, in plain view of the neighbors, and anyone curious enough to approach their home from the golf course to retrieve a golf ball or look at the only home along that section of the course that is not open to public view.  When doing approaching the back fence, all one would have to do is look inside the gaps in their backyard fence to see the marijuana plants.

B.  Proposed Findings of Fact

1.      The front entrance door to the neighbor's home to the south of defendant was located opposite the defendants' pool.  Trans. at 15.

2.    The fence separating the defendants' back yard and the entry walk way for the neighbor to the south was pretty close to five feet tall and did not pose any problems seeing into defendants' back yard. Id.

3.    The pump area in which a bush of marijuana was located was observable from the entry walk way for the neighbor to the south. Id. at 16.

4.    The pump area in which marijuana plants were located was observable from the balcony for the neighbor to the south. Id. at 17 & 47.

5.    The entire backyard, including the pump area, is visible from the southern neighbor's second-floor master bedroom window. Id. at 22, 24

6.    Neighbors to north of defendants have a wooden deck on their second story flat room that overlooks the golf course and defendants' back yard. Id. at 25

7.    Neighbors to the north use their second story deck frequently during the summer. Id. at 25

8.    The pump area in which marijuana plants were located was observable from the side gate. Id. at 23.

9.    Video showing the marijuana near the pump area is not as clear as direct observation on July 3, 2003. Id. at 25

10.    It was possible to see the distinct leaf shape in the marijuana from outside the side gate near the PNM meter. Id. at 25

11.    The plants near the pump were three to four feet tall and were approximately fifteen feet from the side gate. Id. at 26

12.    The wind conditions on July 3, 2003 were mild. Id. at 26

13.    One could see pretty much into a majority of defendants' back yard from the public golf course through the wide gaps in the gate. Id. at 18.

11

14. Defendants' backyard stands out as only backyard along the golf course that is fenced and not open to public view. <u>Id.</u> at 19 & 30-31.

15. Defendants' backyard stands out from other homes along the golf course because of the green, red and yellow fence slates. <u>Id.</u> at 19.

16. Defendants inserted colored slates into chainlink fence when they moved in. <u>Id.</u> at 49.

17. Defendants believed their neighbors were not "nosey" or concerned with defendants' affairs (<u>id.</u> at 202), but they also admitted to not having any control over who their neighbors might invite to their neighbors' homes (<u>id.</u> at 214, 216).

C. Proposed Conclusions of Law

1. The burden of establishing a legitimate expectation of privacy that society is willing to recognize falls on the party claiming the Fourth Amendment violation. <u>See</u> <u>United States v. Cavely</u>, 318 F.3d 987, 993-94 (10th Cir. 2003).

2. Even if the officers observed the marijuana while in defendants' curtilage, they must still establish defendants' had a reasonable expectation of privacy in the marijuana behind the fence to establish a Fourth Amendment violation. <u>See</u> <u>Long</u>, 176 F.3d at 1308, <u>citing</u> <u>Greenwood</u>, 486 U.S. at 39; <u>see also</u> <u>United States v. Shanks</u>, 97 F.3d 977, 979-80 (7th Cir. 1996) (noting that a Forth Amendment violation does not depend solely on curtilage).

12

3.    There is no reasonable expectation of privacy when the incriminating

objects or activities are readily visible to persons on neighboring lands.

United States v. Campbell, 395 F.2d 848 (4th Cir. 1968).

4.    What a person knowingly exposes to the public, even in his own home or

office, is not subject to Fourth Amendment protection. Ciraolo, 476 U.S.

at 213.

5.    Although a yard may be fenced, the homeowner does not have a

reasonable expectation of privacy from naked-eye observations by a

power company repair mechanic on a pole overlooking the yard. Ciraolo,

476 U.S. at 215.

4.    **Leon Good Faith.  Suppression is not an appropriate remedy under Leon
because there was no egregious police conduct that would be deterred by
suppression**

A.   Initial Discussion

The officers' responded to what they reasonably believed was a reliable

citizen tip of a crime presently occurring.  They corroborated Mr. Bryant's

information when their observations of the home tracked with what Mr. Bryant

told them they would find.  They looked though the gate and saw lots marijuana.

They backed of, and even though they later set a security perimeter, the one

officer sent to the backyard took a tactical position consistent with his duties of

watching the back yard.  There was no search at that point.  The affiant

confirmed what the others had already seen and done.  A search warrant was

then obtained in which the Affiant states his basis for identifying marijuana and

concludes marijuana is being grown now at the place to be searched.  The

13

warrant was approved by an Assistant District Attorney whom the Affiant trusts based on previous cases together.  The warrant was then approved by a State District Court.  The search warrant was properly executed.

B.  Proposed Findings of Fact

1.    Officer Gonzales made the decision to back off within a couple of minutes of arriving in the side yard.  Id. at 95.

2.    Officers backed off and left the side yard once the marijuana was identified.  Id. at 95.

3.    *Officer Gonzales had enough for a warrant after his observation of the marijuana near the pool pump in defendants' back yard; has written warrants in the past; he would know what to do to obtain a warrant.* Id. at 95-96.

4.    Officer Gonzales was told to secure residence by a senior Rio Rancho Department of Public Safety officer assigned to the Drug Enforcement Task Force.  Id. at 97-98.

5.    An outside security perimeter was sent in response to defendant because of Mrs. Cousins' actions, not cooperating, unknown threat, very angry, very insistent (demanded the orders of the court twenty times (id. at 103), and very defiant. Id. at 116.

6.    A perimeter was also set for officer's safety, concern for weapons and narcotics, inability to monitor anyone fleeing out back yard with easy access to golf course (id. 101-02); marijuana may be present in combination with other drugs such as methamphetamine.  Id. at 122.

7.    Only one officer used to secure the backyard.  Id. at 49.

14

8.   Officer placed in tactical position—not for investigation.  Id. at 102.

9.   Affiant's observation made outside the gate near the PNM meter based on smell, shape and size.  Id. at 134, 155 & 166.  Affiant in the back yard less than 5 minutes.  Id. at 166.

10.  An Assistant District Attorney gave telephonic concurrence in the warrant, and the Affiant trusted him.  Id. at 164.

C. Proposed Conclusions of Law

1.   The Fourth Amendment's exclusionary rule should not bar the use of evidence obtained by police officers acting in good faith.  United States v. Leon, 468 U.S. 897, 919-20 (1984).

2.   The good faith exception applies when an officer has a good faith but incorrect or mistaken belief regarding a fact.  See United States v. Salinas-Cano, 959 F.2d 861, 865 (10th Cir.1992) (quotation omitted) ( "the Fourth Amendment does not invalidate warrantless searches based on a reasonable mistake of fact. . .").

3.   The motives of the officers, if there were any, are irrelevant to the analysis.  United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995) (an officer's subjective motives for stopping a vehicle are irrelevant).  "Officers should be entitled to rely upon the probable-cause determination of a neutral magistrate when defending an attack on their good faith for either seeking or executing a warrant."  United States v. Corral-Corral, 899 F.2d 927, 939 (10th Cir. 1990).

15

## CONCLUSION

The United States respectfully requests this Court to adopt its proposed findings of fact and conclusions of law, and to deny defendants' motion to suppress evidence.

Respectfully submitted,

DAVID C. IGLESIAS
United States Attorney

BILL PFLUGRATH
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico  87103
(505) 224-1483

I CERTIFY that I did fax a
copy of the foregoing pleading
to Counsel of Record, this _____
day of February 2004.

BILL PFLUGRATH
Assistant United States Attorney

16